Iris ENDERS, Appellant,

v.

Glen PARKER, Personal Representative
of the Estate of Joel W. Kottke,
Appellee.

No. S–11437.

Supreme Court of Alaska.

Oct. 14, 2005.

Rehearing Denied Jan. 17, 2006.

Timothy R. Byrnes, Hughes Thorsness Powell Huddleston & Bauman LLC, Anchorage, for Appellant.

C. James Mathis, Davis & Davis, P.C., Anchorage, for Appellee.

Before: MATTHEWS, EASTAUGH, FABE, and CARPENETI, Justices.

*OPINION*

EASTAUGH, Justice.

## I. INTRODUCTION

Alaska Statute 13.16.435 entitles personal representatives who litigate in "good faith" to recover attorney's fees and costs from the estate. Iris Enders was a personal representative who unsuccessfully challenged Joel Kottke's 1997 will. She argues here that it was error to deny her request for attorney's fees and costs under the statute. Because the good faith required by AS 13.16.435 is implied, but not conclusively established, by the existence of "reasonably arguable grounds" for a will challenge, and because good faith requires that a personal representative act with intent to benefit the successors of the will the representative seeks to uphold, the superior court applied the correct analysis. Furthermore, it did not clearly err in finding that Enders did not act with intent to benefit the successors. Because Enders was therefore not entitled to recover fees and costs from the estate under AS 13.16.435, we affirm.

## II. FACTS AND PROCEEDINGS

Joel Kottke died in October 1997.[1] Per the will he executed in June 1997, most of his estate went to Connie Parker. She was a long-time acquaintance of Joel Kottke; she became closer to him in his later years, developed a relationship with him very similar to a marriage, and also served as his caregiver.

The 1997 will replaced a 1983 will that Joel Kottke had executed while he was married to Martha Kottke. Per the 1983 will, Joel left his entire estate to Martha. Upon her death,

---

1. We set out the facts of this case in greater detail in *Enders v. Parker*, 66 P.3d 11 (Alaska 2003), and *In re Estate of Kottke*, 6 P.3d 243 (Alaska 2000).

the residual estate was to pass one-half to Martha's children and one-half to Joel's siblings. Martha Kottke died in 1991. Following Joel's death, Iris Enders (Martha's daughter) and Ralph Kottke (Joel's brother) challenged the 1997 will, alleging that Connie Parker had an undue influence on Joel and that Joel was suffering from insane delusions when he drafted the 1997 will.

Following a seven-day bench trial, Superior Court Judge Sen K. Tan ruled that there was inadequate evidence to invalidate the 1997 will. Enders appealed that ruling. We affirmed.[2] The superior court then denied Enders's request that the estate be required to pay her attorney's fees and costs under AS 13.16.435. Enders appealed the denial, and we vacated the order denying her request because we held that "AS 13.16.435 does not require that a personal representative or nominated personal representative's actions benefit the estate before the personal representative can recover expenses."[3] We therefore remanded for "specific findings as to whether Enders prosecuted the will contest in good faith."[4] The superior court explicitly found on remand that Enders lacked good faith and again denied Enders's request for attorney's fees under the statute. Enders now appeals that denial.

## III. DISCUSSION

### A. Standard of Review

■ We review questions of law de novo and adopt the rule of law most persuasive in light of precedent, reason, and policy.[5] The parties disagree about how we should review the superior court's conclusion that Enders lacked good faith. Enders argues that we

should review it de novo, while Parker asserts that we should apply the clearly erroneous standard. For the reasons set out below, we conclude that a determination that a personal representative did or did not act in good faith is a fact finding that should be reviewed for clear error. "A finding of fact is clearly erroneous when the reviewing court is left with a definite and firm conviction that the trial court has made a mistake."[6]

### B. A Good Faith Determination Under AS 13.16.435 Is a Factual Finding that We Review Under the Clearly Erroneous Standard.

■ In enacting AS 13.16.435, Alaska adopted § 3–720 of the Uniform Probate Code (UPC). Alaska Statute 13.16.435 provides that personal representatives or persons nominated as personal representatives can receive litigation expenses from the estate if they can show that they prosecuted or defended proceedings in "good faith."[7] We interpreted AS 13.16.435 for the first time in *Enders v. Parker* and made a number of observations about the meaning of the term "good faith" as it is used in AS 13.16.435.[8] We stated that "[a]lthough 'good faith' is not defined in the probate statutes, the statutory obligations of the personal representative shed light on the meaning of that term."[9] Alaska Statute 13.16.350(a) provides in part: "A personal representative is a fiduciary who shall observe the standards of care applicable to trustees...." We observed that

> in the context of two competing wills with different personal representatives, it is to be expected that the "successors" will not be identical. Each personal representative thus must act for the best interests of the

2. *Estate of Kottke*, 6 P.3d at 247.

3. *Enders*, 66 P.3d at 13.

4. *Id.*

5. *Catalina Yachts v. Pierce*, 105 P.3d 125, 128 (Alaska 2005).

6. *McComas v. Kirn*, 105 P.3d 1130, 1132 (Alaska 2005).

7. AS 13.16.435 discusses recovery of a personal representative's expenses in estate litigation and provides:

> If any personal representative or person nominated as personal representative defends or prosecutes any proceeding in good faith, whether successful or not, that person is entitled to receive from the estate necessary expenses and disbursements including reasonable attorney fees incurred.

8. *Enders v. Parker*, 66 P.3d 11, 16–17 (Alaska 2003).

9. *Id.* at 16.

successors named in the will which each personal representative is respectively seeking to uphold. We hold that "good faith" under AS 13.16.435 incorporates the statutory requirement that a personal representative *act with the intent to benefit successors* named in the instrument the personal representative seeks to uphold.... [10]

We also stated that the superior court, when making its findings concerning good faith on remand, "should consider whether Enders had *reasonably arguable grounds* to challenge the 1997 will. Presence of such grounds would imply good faith on her part; absence of such grounds would imply a lack of good faith." [11]

Enders contends that the standard of review cannot be clear error because she asserts that we remanded the case for a determination of whether she had "reasonably arguable grounds" to challenge the will. Enders equates this inquiry to asking whether the challenge was frivolous; she therefore argues that the superior court should have taken every factual inference in her favor and assumed the credibility of her witnesses. In essence, Enders asserts that reasonably arguable grounds exist if a claim would have survived summary judgment. Because summary judgment rulings are reviewed de novo,[12] Enders reasons that the same standard applies to review of the superior court's resolution of the good faith issue.

■ Enders's theories rest on a misunderstanding of our remand instructions in *Enders*. We did not remand for a determination of whether Enders had reasonably arguable grounds to challenge the 1997 will, but rather for specific findings on the issue of good faith and for *consideration* of whether Enders had reasonably arguable grounds for her claims.[13] If she had reasonably arguable grounds, it would imply good faith; if she did not, it would imply a lack of good faith.[14] *Enders* did not adopt "reasonably arguable grounds" as the sole determinant of good faith under AS 13.16.435. Rather, the presence or absence of reasonably arguable grounds creates a presumption of good faith or lack of good faith, respectively. This presumption can be rebutted by evidence sufficient to establish good faith or lack thereof, as the case may be.

Nebraska Revised Statute § 30–2481 is identical to AS 13.16.435.[15] The Nebraska Supreme Court has held that "[t]he good faith required in § 30–2481 is an ultimate fact for the court's decision upon all of the evidence. There are no rules defining it; rather, it depends upon the peculiar facts and circumstances existing in each case, including the duties imposed ... by law." [16] *Enders* held that one such duty requires the personal representative to "act with the intent to benefit successors named in the instrument the personal representative seeks to uphold" where there are "two competing wills with different personal representatives...." [17] It would therefore be incorrect to reduce the entire good faith inquiry to the single question of whether the personal representative had reasonably arguable grounds to act. The good faith inquiry requires a factual determination of intent that we review for

---

**10.** *Id.* at 17 (emphasis added). We note that the legal fees incurred in this case unfortunately threaten to exhaust the proceeds of Joel Kottke's estate. We have no occasion here to consider whether a representative owes duties to inform the successors of a disputed will of the expected litigation costs relative to the size of the estate, or to what extent a representative may exhaust the estate in an attempt to uphold the will.

**11.** *Id.* (emphasis added).

**12.** *See, e.g., Alaska Ctr. for Env't v. Rue,* 95 P.3d 924, 926 (Alaska 2004) ("We review the superior court's decision on summary judgment de novo.").

**13.** *Enders,* 66 P.3d at 17.

**14.** *Id.*

**15.** The statutes are the same, except that Alaska has incorporated gender-neutral language in its version of UPC § 3–720.

**16.** *In re Estate of Odineal,* 220 Neb. 168, 368 N.W.2d 800, 803 (1985) (citation omitted).

**17.** *Enders,* 66 P.3d at 17.

clear error.[18]

Enders's apparent suggestion that Alaska Civil Rule 11—which also contains a good faith standard—should dictate de novo review by analogy, is flawed because we review an award of sanctions under Civil Rule 11 for abuse of discretion.[19]

## C. Surviving Summary Judgment Does Not Necessarily Mean "Reasonably Arguable Grounds" Exist.

■ As noted above, the presence of reasonably arguable grounds for a will contest implies that a personal representative acted in good faith under AS 13.16.435. Enders advances a number of arguments about how trial courts should decide whether there are reasonably arguable grounds.

She argues that the superior court, when considering whether Enders had reasonably arguable grounds, should have looked at whether Enders raised a genuine issue of material fact. In other words, she reasons that if the claim survived or would have survived a motion for summary judgment the superior court was required to find that reasonably arguable grounds existed. Enders refers us to Federal Rule of Civil Procedure 11, which requires that "allegations and other factual contentions have evidentiary support." [20] The Advisory Committee notes to the federal rule state that "if a party has evidence with respect to a contention that would suffice to defeat a motion for summary judgment based thereon, it would have sufficient 'evidentiary support.'" [21] Enders therefore argues that in considering whether she had reasonably arguable grounds, the superior court, just as it would in reviewing an opposing party's motion for summary judgment, was required to "giv[e] every factual inference to [her]" and "assume the credibility of her witnesses."

■ But just because Enders's claim survived, or would have survived, summary judgment does not establish that there were reasonably arguable grounds to challenge the will. Upon a motion for summary judgment, "[t]he evidence of the non-movant is to be

18. Courts in other jurisdictions that have adopted UPC § 3–720 similarly apply the clearly erroneous standard when reviewing a finding of good faith. *See In re Estate of McMurchie,* 321 Mont. 21, 89 P.3d 18, 22 (2004); *In re Estate of Watkins,* 243 Neb. 583, 501 N.W.2d 292, 297 (1993); *In re Estate of Hass,* 643 N.W.2d 713, 720 (N.D.2002). Other courts review for abuse of discretion. *See In re Estate of Herbert,* 91 Hawai'i 107, 979 P.2d 1133, 1135 (1999); *Matter of Eliasen's Estate,* 105 Idaho 234, 668 P.2d 110, 117 (1983).

19. *See Keen v. Ruddy,* 784 P.2d 653, 658 (Alaska 1989). "We will find an abuse of discretion only if, based on a review of the whole record, we are left with a definite and firm conviction that a mistake has been made." *Alden H. v. State, Office of Children's Servs.,* 108 P.3d 224, 228 (Alaska 2005).

20. Fed.R.Civ.P. 11(b)(3). Federal Rule of Civil Procedure 11 differs from Alaska's corresponding rule. Federal Rule 11 provides in relevant part:

By presenting to the court (whether by signing, filing, submitting, or later advocating) a pleading, written motion, or other paper, an attorney or unrepresented party is certifying that to the best of the person's knowledge, information, and belief, formed after an inquiry reasonable under the circumstances, ... the claims, defenses, and other legal contentions therein are warranted by existing law or by a nonfrivolous argument for the extension, modification, or reversal of existing law or the establishment of new law ... [and that] the allegations and other factual contentions have *evidentiary support* or, if specifically so identified, are likely to have evidentiary support after a reasonable opportunity for further investigation or discovery....

(Emphasis added.)

Alaska Civil Rule 11 provides in relevant part: The signature of an attorney or party constitutes a certificate by the signer that the signer has read the pleading, motion, or other paper; that to the best of the signer's knowledge, information, and belief formed after reasonable inquiry it is well grounded in fact and is warranted by existing law or a *good faith* argument for the extension, modification, or reversal of existing law....

(Emphasis added.)

Enders relies on the "evidentiary support" language found in the federal rule, but not in the Alaska rule, in arguing that reasonably arguable grounds existed if a claim would have survived summary judgment. Enders also claims that because both AS 13.16.435 and Alaska Civil Rule 11 contain the phrase "good faith," the superior court erred by denying her statutory fee application even though it did not sanction her attorney under Alaska Civil Rule 11. We discuss this contention in Part III.D.3.

21. Fed.R.Civ.P. 11(b) advisory committee's note (1993 amend.).

believed, and all justifiable inferences are to be drawn in his [or her] favor."[22] Any reasonable litigant, especially one represented by counsel, should know that his or her claim will not receive these advantages during trial. Moreover, commentators have observed that "[t]he burden on the nonmoving party is not a heavy one; the nonmoving party simply is required to show specific facts, as opposed to general allegations, that present a genuine issue worthy of trial."[23] In other words, "summary judgment should be relied upon to weed out frivolous lawsuits and avoid wasteful trials."[24] By the same token, a claim that is dismissed on summary judgment does not necessarily lack reasonably arguable grounds, because the claim may turn on a question of law.[25]

In our view, it would not be sound policy to adopt a per se rule that reasonably arguable grounds must exist under AS 13.16.435 if a claim survives or would have survived summary judgment. The Advisory Committee notes to Federal Civil Rule 11 provide that an assertion or claim is deemed to have "evidentiary support" if it was capable of surviving a motion for summary judgment. Important considerations underlie this view, as courts have expressed concern that the federal rule not "stifle creative advocacy" or "chill an attorney's enthusiasm in pursuing factual or legal theories."[26] Similar concerns do not arise in the context of AS 13.16.435. Although we do not wish to discourage pursuit of meritorious claims, we must also recognize the importance of upholding the testator's intent.[27] Personal representatives who pursue will contests that might survive summary judgment but have no reasonable chance of succeeding at trial waste the estate and impede the fulfillment of the testator's wishes, all while conferring no benefit on the successors to whom the personal representative is a fiduciary. We are therefore unpersuaded by Enders's argument that reasonably arguable grounds necessarily exist if a claim was capable of defeating a summary judgment motion.

The standard for determining whether reasonably arguable grounds existed will vary according to what the personal representative sought to accomplish. In this case, Enders sought to defeat the 1997 will, leaving the 1983 will. Because her claims turned on disputed factual issues, this would have required her to prevail at trial; the relevant question is therefore whether there was a reasonable chance the court would ultimately rule for Enders after trial on either ground she raised in challenging the 1997 will. A pure question of law, however, could be resolved on summary judgment. The reasonably-arguable-grounds inquiry would in that case turn on whether there was a reasonable chance of prevailing at summary judgment.

We also note that one of Enders's contentions may have some relevance to the reasonably-arguable-grounds inquiry. She contends that whether a litigant had reasonably

---

**22.** *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

**23.** 10A WRIGHT, MILLER & KANE, FEDERAL PRACTICE AND PROCEDURE: CIVIL § 2727 (3d ed.1998). It is at least as easy to defeat a summary judgment motion in Alaska as it is under the federal rules. *See, e.g., Alakayak v. British Columbia Packers, Ltd.*, 48 P.3d 432, 449 (Alaska 2002) (stating nonmovant "must present enough evidence to 'reasonably tend[ ] to dispute or contradict' the evidence presented by the [movant]") (quoting *Yurioff v. Am. Honda Motor Co.*, 803 P.2d 386, 389 (Alaska 1990)).

**24.** 10A WRIGHT, MILLER & KANE, FEDERAL PRACTICE AND PROCEDURE: CIVIL § 2712 (3d ed.1998).

**25.** *Id.* at § 2725.

**26.** *Merriman v. Sec. Ins. Co. of Hartford*, 100 F.3d 1187, 1194 (5th Cir.1996). *See also Hartmarx Corp. v. Abboud*, 326 F.3d 862, 867 (7th Cir.2003) ("[Rule 11] sanctions are to be imposed sparingly, as they can have significant impact beyond the merits of the individual case and can affect the reputation and creativity of counsel.") (internal quotation marks omitted).

**27.** This observation relates to Enders's suggestion that "one of the intended purposes of AS 13.16.435 is to encourage [w]ill contests" and that "disallowing an AS 13.16.435 claim by a losing [w]ill contestant would have a chilling effect." AS 13.16.435 encourages *good faith* will contests in part, to "discover and make effective the intent of a decedent." *Enders*, 66 P.3d at 15 n. 14 (emphasis added) (quoting AS 13.06.010(b)(2)). Denying a request for fees from a personal representative who acts in bad faith, implied by a lack of reasonably arguable grounds, does not "chill" this purpose.

arguable grounds "has to be judged at the outset, based on the witnesses and evidence of the party whose good faith is challenged." This implies that reasonably arguable grounds may exist when an action is first filed but may dissipate as litigation proceeds. A personal representative could therefore have reasonably arguable grounds to challenge a will but then learn through discovery that the claim lacks merit. In considering whether there were reasonably arguable grounds for the action, the trial court should examine what the personal representative knew or should have known about the merits of the claim as it proceeded.

### D. The Superior Court's Finding that Enders Lacked Good Faith Was Not Clearly Erroneous.

Having resolved Enders's contentions regarding the standard of review and the rea-

sonably-arguable-grounds inquiry, we turn to her argument that the superior court's findings of fact were clearly erroneous.[28] The superior court found that Enders did not have reasonably arguable grounds to challenge the 1997 will. It also found that she did not act with the intent to benefit the successors of the 1983 will because Enders "brought and pursued the will contest for her own personal benefit and self-interest, motivated by her and her family's personal animosity and disdain for Connie Parker." Ultimately, the superior court found that Enders lacked good faith.

### 1. The superior court's finding that Enders lacked reasonably arguable grounds to challenge the 1997 will was not clearly erroneous.

■ Enders disputes the superior court finding that Enders did not have reasonably arguable grounds to challenge the 1997 will.

---

**28.** Enders's briefs and citations to supplemental authority point to cases that supposedly do not support the superior court's decision. She places particular emphasis on *Crittell v. Bingo,* 83 P.3d 532 (Alaska 2004), and *Alaska Wildlife Alliance v. State,* 74 P.3d 201 (Alaska 2003). We held in *Crittell* that AS 13.16.435 "did not apply to the interested parties' [Bingo et al.] request for fees, since they did not bring their case as personal representatives and did not claim to be persons nominated as personal representatives." 83 P.3d at 536. *Crittell* claimed to be a personal representative, but we affirmed the superior court's finding that he "had acted fraudulently in claiming to represent the estate under this will and that the will itself was fraudulent." *Id.* Thus, *Crittell* never addressed good faith under AS 13.16.435. In *Alaska Wildlife Alliance,* we reversed an award of fees against a public interest litigant under Alaska Civil Rule 82 for bringing claims in bad faith because we concluded that the claims were "reasonably debatable." 74 P.3d at 208. Good faith under AS 13.16.435 was therefore not at issue.

Most of the other cases cited by Enders similarly involved non-fiduciaries and disputes about whether they acted in good faith. *See Hammond v. State, Dep't of Transp. & Pub. Facilities,* 107 P.3d 871 (Alaska 2005); *Alderman v. Iditarod Props., Inc.,* 104 P.3d 136 (Alaska 2004); *In re Estate of Bickling,* 2004 WL 1813291, *15 (Del. Ch.2004); *In re Estate of Delaney,* 819 A.2d 968, 977–78 & 998–99 (D.C.2003); *In re Estate of Marquis,* 822 A.2d 1153, 1159 (Me.2003); *In re Estate of Fields,* 46 P.3d 176, 177 (Okla.Civ.App. 2001); *Estate of Davis v. Cook,* 9 S.W.3d 288, 291–92 & 297–98 (Tex.App.1999). They therefore do not apply to this case, because Enders's fiduciary duty required her to act with the intent

to benefit the successors. The superior court did in fact find that Enders's actions were intentional, so *Martin v. Dieringer,* 108 P.3d 234, 240 (Alaska 2005), is inapposite.

Enders also cites *In re Estate of Falck,* 665 N.W.2d 440 (Iowa App.2003) (table), and *In re Estate of Kessler,* 95 Wash.App. 358, 977 P.2d 591 (1999). Iowa's good faith "standard is an objective one, not a reference to the personal representative's reasonable belief." *Matter of Estate of Olson,* 479 N.W.2d 610, 614 (Iowa App.1991). Because we look to the personal representative's subjective intent, *Falck* does not apply. Washington law provides that an unsuccessful will contestant may be assessed costs "unless it appears that the contestant acted with probable cause and in good faith." Revised Code of Washington 11.24.050. At issue in *Kessler* was whether the contestants had raised "debatable issues," not whether they acted in good faith. 977 P.2d at 605. Accordingly, *Kessler* has no bearing on the present case.

Finally, Enders refers to *In re Estate of Johnson,* 119 P.3d 425 (Alaska 2005), in support of her arguments that (1) we should review the superior court's finding de novo; (2) the superior court ignored evidence and failed to conduct an evidentiary hearing or permit discovery; (3) Parker argues for a finding of bad faith against Enders to protect Parker's attorney's fees; (4) Parker mismanaged the Kottke estate by "refus[ing] to countenance the possibility of any settlement"; and (5) we should not remand this case for further review of the good faith question but should instead reverse and award full fees to Enders. Having considered these contentions, we conclude that *Johnson* does not affect the outcome of this case.

### a. Undue influence claim

The superior court found that Enders's undue influence claim was "at best weak" and "not particularly well founded." Enders argues that this finding "falls short" of finding the claim was not supported by reasonably arguable grounds and that the witnesses she called "established by their testimony alone a prima facie case of undue influence." We have previously discussed the circumstances that would permit a finding of undue influence:

> In situations in which the defendant is the "principal or sole beneficiary," had a "confidential relationship" with the testator, and "participated in the drafting of the will," the defendant is presumed to have exercised undue influence, and must prove otherwise. If those circumstances do not apply, to show undue influence the plaintiff must show that "by reason of influence exercised by [the defendant], the testator was virtually compelled to make a will which he would not have made had he been left to the free exercise of his own judgment and wishes." [29]

In considering whether Enders had reasonably arguable grounds to pursue the undue influence theory, the superior court noted that, before Joel Kottke died, Enders had raised concerns about undue influence with the Division of Senior Services. One of the division's social workers, John Burke, testified that he had investigated a complaint that Connie Parker was "coerc[ing Joel] into changing his will." Burke testified that he interviewed Joel and that he concluded in his report that " 'Mr. Kottke ... was extremely clear thinking and in control of what he wanted to do.' " [30] Burke found no reason to pursue the matter further. The superior court also observed that Enders had contacted one of Joel Kottke's friends, Robert Dixon, both before and after Joel's death and claimed that Connie provided inadequate care for Joel, unduly influenced him, and delayed the provision of medical attention. Dixon responded that he was "not seeing

that." Noting the testimony of Burke, Dixon, and others, the superior court concluded that "Iris Enders knew or should have known that the grounds for an undue influence claim were not particularly well founded. Her immense dislike of Connie Parker apparently blinded her to the strength or weakness of her claim."

Several of Enders's witnesses testified about their impressions of Connie and Joel's relationship, especially their sense that Connie dominated or controlled Joel. Lois Kottke testified that she had concerns over the level of control Connie exercised over Joel. Leonard Klima testified that Connie Parker was "very dominating and almost deceitful in her actions at times." He believed that the relationship was not loving; rather he thought "[i]t was a little on the mercenary side on the part of Connie." Ellen Onstott testified that she thought that Connie had "domination" over Joel. Ralph Kottke and Iris Enders testified that they believed Connie Parker was influencing Joel with sex.

We note that many of the witnesses called by Enders admitted to having spent a relatively minimal amount of time observing Joel and Connie's relationship. Eunice Kottke visited Joel once in 1996 and possibly saw him twice in Minnesota during the 1990s. Lois Kottke only observed Joel and Connie together for a total of twenty days during the entire 1990s. Leonard Klima's only in-person contact with Joel was during a seven-day period shortly before Joel died. Richard and Ellen Onstott saw Joel Kottke "once, maybe twice a year" during the 1990s. As a result, we cannot say that the superior court erred in finding that Enders had no reasonably arguable grounds to pursue the undue influence claim. The testimony of a few witnesses who had limited exposure to Joel and Connie's relationship does not leave us with a definite and firm conviction that the superior court made a mistake, especially given evidence that a disinterested professional, John Burke, investigated Enders's claim and found no reason for concern.

---

**29.** *Helgason v. Merriman,* 36 P.3d 703, 708 (Alaska 2001) (quoting *Paskvan v. Mesich,* 455 P.2d 229, 232–33 (Alaska 1969), and *In re Estate of Kraft,* 374 P.2d 413, 417 (Alaska 1962)).

**30.** Burke's investigation was not an extensive one, however. He testified that his interview with Joel "probably was in the area of 15 minutes."

### b. Insane delusions claim

The superior court found that Enders's claim of insane delusions was "even weaker" than the claim of undue influence and concluded that "[n]o evidence indicates that Mr. Kottke was insane or suffered from any delusion." Enders states that she decided not to brief this issue on appeal "due to space limitations and because it is not necessary[ ] to prove good faith." In any case, the superior court's finding was not clearly erroneous.

The superior court observed that "[t]he basis for this claim was Mr. Kottke's belief that Ms. Enders had 'rifled his safe' and taken his will." The superior court pointed out that Enders's own actions had provided a basis for Kottke's belief—she had removed items from his house on at least two occasions. The fact that Kottke's friends and other independent witnesses unanimously testified that they never observed any delusional behavior from Joel Kottke confirms that Enders's insane delusions claim was extremely tenuous. Roxanne Olson testified that Joel Kottke was "truly coherent" a few days before he died. Linda Plettner and Peggy Bell testified that they never observed any delusional behavior from Joel Kottke. Dr. John Wrigley, Joel Kottke's urologist, testified that he never saw any evidence of insane delusions. Max Gruenberg, Jr., an attorney initially approached by Kottke about drafting a new will, testified that Kottke appeared "alert" and that he wanted to "have a will done."

Although we had not yet addressed the issue of insane delusions when Enders challenged the 1997 will,[31] she would not have had reasonably arguable grounds to pursue an insane delusions claim under any standard we might have adopted.[32]

### 2. The superior court's finding that Enders acted out of animosity and disdain was not clearly erroneous.

■ The superior court's finding that Enders did not have reasonably arguable grounds to challenge the 1997 will implied that she did not act with an intent to benefit the successors and therefore lacked good faith. For Enders to have prevailed, there must have been sufficient evidence to overcome the resulting presumption.

The superior court, however, found that Enders's "real motivation" was the "personal animosity and disdain" she and her family had for Connie Parker. Enders argues that she "had no such ulterior motive" and "sincerely expected and hoped to prevail on the merits." The superior court also found that Enders "brought and pursued the will contest for her own personal benefit and self-interest." We need not address this finding because we conclude that the superior court did not clearly err in finding that Enders acted out of animosity and disdain for Parker; she therefore failed to rebut the implication that she did not act with the intent to benefit the successors of the 1983 will.

The superior court observed that "Ms. Enders and her family were outspoken in their animosity towards Connie Parker. This animosity was clear from Ms. Enders and her witnesses from their demeanor on the witness stand." Evidence supported these findings. For example, Greg Enders, Iris's son, testified that he thought Connie Parker was an "intrusive person" and a "decrepit old woman." He felt that Connie Parker was "just unreal." He testified that he was "almost in shock just to even be in the same room with the woman [Connie]" and that he was offended by her even before her

---

**31.** We first discussed a claim of insane delusions in *In re Estate of Kottke*, 6 P.3d 243 (Alaska 2000). We held that

"an insane delusion is a belief which has absolutely no foundation in fact, and even slight evidence which provides a basis for the belief negates the existence of a delusion." Beliefs based on fact but derived from faulty logic or distorted by emotion will not support a claim of insane delusions. Thus, the belief must be totally devoid of reason and must lack even a glimmer of a factual basis.

*Id.* at 246 (quoting *Dillon v. Phillips*, 92 Or.App. 65, 756 P.2d 1278, 1279 (1988)) (citation omitted).

**32.** *See* 1 WILLIAM J. BOWE & DOUGLAS H. PARKER, PAGE ON THE LAW OF WILLS § 12.30, at 718–20 (rev. ed.1960), 718–20 (2003) (listing various definitions courts have applied to "insane delusions"); § 12.35, at 730 (observing that if a belief "is based on some evidence, though possibly insufficient, it does not amount to an insane delusion").

relationship with Joel Kottke. Iris Enders testified that she felt Parker was abrasive with her and that she "didn't have to like [Parker]" even though she could accept Joel's decision to remain with her. Enders also testified that, because of the type of person Parker was, she did not think Joel would have stayed with Parker if Parker was not providing sex to him.

The superior court also noted that Enders "called many witnesses at trial to testify that [ ] Connie Parker was not good enough for Joel Kottke," that he "had no affection" for Parker, and that their relationship "was a travesty." For example, Eunice Kottke testified that she thought that Connie and Joel's relationship was not "up to my [Eunice's] standards." Leonard Klima testified that Parker "couldn't carry a conversation with [Joel]" because "she wasn't up to his intellect." Greg Enders testified that he thought Joel and Connie's relationship was a "joke" and that she was "forcing herself on [Joel] all the time." The superior court rejected this testimony as "highly inaccurate," instead finding that "Joel Kottke and Connie Parker lived and aged together and enjoyed a loving and committed intimate relationship."

■■ The superior court noted that several of Joel and Connie's close friends testified that the couple "had a loving respectful relationship." The superior court found that "these friends, as disinterested witnesses, [were] highly credible." [33] Robert Dixon testified that Joel and Connie treated each other with respect and that they had a "loving relationship." Maureen Morgan testified that Joel and Connie seemed "compatible and happy" and that they treated each other with respect, compassion, and affection. Peggy Burgin testified that Joel and Connie "seemed like a very happy couple." The superior court found that Enders's strategy of "mischaracteriz[ing]" Joel and Connie's relationship illustrated her and her family's "complete inability to accept Connie Parker

and the intimate and important role she played in Joel's life."

There was some testimony that tended to show that Enders challenged the 1997 will because she believed it was invalid. For example, Enders testified that "[t]his case is about [Joel's] will being upheld, his original will, which is what he really, truly wanted." When asked about her ultimate goal in litigating the case, Enders responded:

> The ultimate goal is that Connie Parker withheld from the family his illness. She let Joel believe that we were not there for him, that we did not care for him, she wouldn't tell us when he was sick, she didn't tell us who his doctors were, she wouldn't let us speak to him on the phone, she wanted to get a restraining order against me to keep me from coming up to the hospital, she didn't call me when he went to the hospital.

On the one hand, this testimony indicates that Enders challenged the will because she believed that Parker unduly influenced Joel's decision to disinherit his family by obstructing the family's access to Joel. On the other hand, much of this testimony relates to Enders's dissatisfaction with the way Parker treated Enders and her family during the late stages of Joel's illness, after he had executed the 1997 will.[34]

In the end, the superior court found that Enders was motivated by animosity toward Parker and by Enders's family's refusal to "respect and accept Mr. Kottke's decision about what he wanted to do in the will." It made this finding after hearing testimony for several days and observing the demeanor of numerous witnesses. Because there was sufficient evidence that Enders and her family intensely disliked Connie Parker, we cannot say that we are left with a definite and firm conviction that the superior court erred in finding that Enders's "real motivation" was animosity and disdain for Connie Parker.

**33.** "Witness credibility decisions are left to the trial court." *Barios v. Brooks Range Supply, Inc.*, 26 P.3d 1082, 1087 (Alaska 2001).

**34.** Joel executed his last will on June 10, 1997. According to his medical records, Joel was feeling well as of June 16, 1997. He was hospital-
ized for four days in late July after suffering a small stroke. Joel was also hospitalized in early September, during which his progressive cancer was described as "approaching end-stage." Joel was admitted to the hospital in late September for the final time; he died on October 1.

3. **The superior court's denial of prevailing-party fees to Parker and the fact that sanctions were not imposed against Enders's attorney have no bearing on the superior court's finding that Enders lacked good faith.**

Enders claims that because the superior court did not order her to pay Parker's attorney's fees under Alaska Civil Rule 82, the superior court must have viewed "bad faith" under AS 13.16.435 as "something less" than "bad faith" under Rule 82. Enders views this "distinction" as having "no basis in law" because "bad faith is bad faith." But the superior court's decision not to grant Parker's Rule 82 motion had nothing to do with good faith or bad faith; in denying the motion, the court explained that Rule 82 applies "[e]xcept as otherwise provided by law"[35] and that AS 13.16.435 provides a specific statutory scheme for costs and fees.[36] In other words, AS 13.16.435 governs here.

We also reject Enders's argument that it was inconsistent for the superior court to find that Enders lacked good faith but not to sanction her attorney for violating Alaska Civil Rule 11.[37] Even if Enders's attorney had violated Rule 11, sanctions are not mandatory[38] and "a trial court's imposition or non-imposition of sanctions [is] subject to review only for abuse of discretion."[39] We express no opinion about whether sanctions would have been appropriate here and note only that the absence of sanctions against Enders's attorney does not mean that the superior court somehow erred in finding that Enders lacked good faith.

E. **Declining To Hold an Evidentiary Hearing or Address Post–Trial Affidavits on Remand Was Not an Abuse of Discretion.**

Enders argues that the superior court erred by "ignoring" post-trial affidavits in which Enders and her counsel asserted that Enders had acted in good faith. The superior court also declined to hold an evidentiary hearing. Enders relies on *Luedtke v. Nabors Alaska Drilling, Inc.*, in which we held that "Luedtke should have been given the opportunity to contest the [Civil Rule 11] sanction award at a hearing, and the superior court should have indicated its reasons for imposing the sanction."[40] Even if we assume that *Luedtke* is analogous, it is inapposite because the superior court conducted a hearing during which Enders had the opportunity to contest the good faith issue. The superior court also provided a detailed and thorough explanation for its findings.

Moreover, we have held that " 'a remand for additional findings does not [ordinarily] obligate the trial court to hear new evidence' "[41] and that " '[w]e will reverse a trial court's refusal to receive new evidence on remand only when the refusal constitutes an abuse of discretion, unless we have expressly called for a new trial or evidentiary hearing.' "[42] In this case, we remanded for "specific findings as to whether Enders prosecuted the will contest in good faith and a

---

**35.** Alaska R. Civ. P. 82(a).

**36.** We affirmed this analysis in *Enders v. Parker,* holding that Civil Rule 82 does not apply when expenses are recoverable under AS 13.16.435. 66 P.3d at 17.

**37.** *See supra* note 20 for the relevant text of Alaska R. Civ. P. 11. Unlike its federal counterpart, Alaska Civil Rule 11 does not provide for sanctions. Instead, Alaska Civil Rule 95 states that a court "may withhold or assess costs or attorney's fees" for "any infraction of these rules," including Civil Rule 11.

**38.** "[T]he court *may* withhold or assess costs or attorney's fees as the circumstances of the case and discouragement of like conduct in the future *may* require; and such costs and attorney's fees

may be imposed upon offending attorneys or parties." Alaska R. Civ. P. 95(a) (emphasis added).

**39.** *Alaska Fed. Sav. & Loan Ass'n of Juneau v. Bernhardt,* 794 P.2d 579, 583 (Alaska 1990); *see also In re Schmidt,* 114 P.3d 816, 819 (Alaska 2005) ("We review awards of attorney's fees and sanctions for abuse of discretion.").

**40.** *Luedtke v. Nabors Alaska Drilling, Inc.,* 834 P.2d 1220, 1227 (Alaska 1992).

**41.** *R.J.M. v. State, Dep't of Health & Soc. Servs.,* 973 P.2d 79, 86 (Alaska 1999) (quoting *Murray v. Murray,* 856 P.2d 463, 466 (Alaska 1993)).

**42.** *Id.*

redetermination of the AS 13.16.435 claim."[43] We did not mandate an evidentiary hearing. The superior court therefore had discretion to decide whether to conduct an evidentiary hearing or accept additional evidence on the question of good faith.[44]

The superior court stated that it did not initially make an explicit finding of bad faith because it hoped that "by making implicit findings, Ms. Enders would retain her dignity and that the court would not have to explicitly find bad faith." We observed in *Enders* that the issue of good faith had already been "extensively litigated."[45] Following remand, the superior court reviewed the trial transcript, held oral argument, and accepted briefs and additional materials from the parties. Given these circumstances, it was not an abuse of discretion for the superior court to not hold an evidentiary hearing and to not explicitly address in its findings the affidavits submitted by Enders.[46]

### F. The Superior Court Complied with Our Remand Instructions.

Enders argues that in *Enders v. Parker* we "ordered Judge Tan to analyze evidence he had previously ignored" and that he simply cited evidence that we had already ruled did not amount to bad faith. She compares the superior court's decision with the actions of the judge in *Davis v. Hallett.*[47] We there reversed an award of full attorney's fees and remanded for consideration of a partially compensatory award.[48] The superior court on remand reduced the previous award of $11,519.15 by only $19.15.[49] We held that

this "violated both the letter and spirit of our prior decision" and that it was an "apparent flouting of our mandate."[50]

We clearly stated in *Enders* that we were remanding for explicit findings on the question of good faith.[51] We did not hold or suggest that the evidence cited by the superior court in its first set of findings could not establish bad faith or that the superior court had to examine other evidence.[52] We requested specific findings because we were "unable to say that the court would have explicitly found a lack of good faith" had it applied the appropriate legal standard.[53] The superior court therefore complied with our instructions when it specifically found that Enders lacked good faith. Nor does the record permit any reasonable inference that the superior court was biased against Enders, as she seems to imply. Accordingly, Enders's argument that the superior court flouted our mandate is wholly without merit.

## IV. CONCLUSION

We therefore AFFIRM the superior court's decision denying appellant an award under AS 13.16.435.

BRYNER, Chief Justice, not participating.

---

**43.** *Enders*, 66 P.3d at 17.

**44.** "[A] trial court 'has no authority to deviate from a specific mandate of the supreme court but may take actions not inconsistent with [the supreme court's] decision.'" *R.J.M.*, 973 P.2d at 86 (quoting *A.M. v. State*, 945 P.2d 296, 300–01 (Alaska 1997)).

**45.** *Enders*, 66 P.3d at 16.

**46.** Enders also cites *Hammond v. State, Dep't of Transp. & Pub. Facilities*, 107 P.3d 871 (Alaska 2005), in support of her argument that the superior court was required to consider the affidavits. *Hammond* held that an arbitration decision did not preclude statutory claims from being pursued in court so long as the statutory claims were not

clearly and unmistakably submitted to arbitration. *Id.* at 872. There is no question of res judicata here; *Hammond* is not applicable.

**47.** *Davis v. Hallett*, 630 P.2d 1 (Alaska 1981).

**48.** *Id.* at 2.

**49.** *Id.*

**50.** *Id.*

**51.** *Enders*, 66 P.3d at 16, 17.

**52.** *Id.*

**53.** *Id.* at 16.